**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

AS Hotels, Inc., *et al.*,

Plaintiffs,

v.

Village of Buckeye Lake, Ohio, *et al.*,

Defendants.

Case No. 2:23-cv-3371
District Judge James L. Graham
Magistrate Judge Kimberly A. Jolson

Opinion and Order

This action is brought under 42 U.S.C. § 1983 and arises from events which occurred in April 2023 after the Village of Buckeye Lake received a bedbug complaint about the Lake Inn. The Complaint alleges that the Village denied the owners of the Lake Inn due process when officials shut it down for about one month. The Complaint also alleges that Village police officers unlawfully apprehended an employee of the Inn. The Complaint asserts several other claims, which are discussed in detail below. This matter is before the Court on defendants' motion for summary judgment. For the reasons stated below, the motion is granted in part and denied in part.

## I. Factual Background

### A. The Parties

Plaintiff AS Hotels, Inc. is an Ohio corporation which owns the Lake Inn. Plaintiffs Sucha "Sonny" Singh and his wife Harbhajan "Gori" Kaur own AS Hotels. They are American citizens who were born in India. They came to the United States about 38 years ago when they were in their mid-20s. *See* Singh Dep. at 9, 15. Plaintiff Amandeep "Aman" Kaur is in her 40s and is also an American citizen originally from India. *See* A. Kaur Dep. at 10, 77. Aman is employed as the manager of the Inn. *See id.* at 24. The record is unclear as to whether Aman is related to Sonny or Gori. *Compare id.* at 13–15 (Aman explaining that she is not related by blood to Sonny or Gori but they are all part of a Sikh religious family) *with* Plaintiffs' Video Ex. B at time stamp 16:09:03 (Gori telling police officers on body cam footage that she is Aman's sister).

Defendant Village of Buckeye Lake is a statutory village organized under Ohio law. Defendant Jason Harget is the Chief of Police for the Village. Defendants Hiroki Barker and Michael Pereira are police officers for the Village. Defendant Jeryne Peterson was the Mayor of the Village during the

events at issue. Though the case caption of the Complaint lists the individual defendants as being sued in their official capacities, the Complaint elsewhere makes clear that they are also being sued in their individual capacities. *See*, *e.g.*, Compl., ¶¶ 73, 80, 109, 178, 187.

**B. The Lake Inn**

The Lake Inn is a two-story motel with 96 rooms. *See* A. Kaur Dep. at 41, 70. It is the only hotel or motel in the Village of Buckeye Lake. *See id.* at 37. In addition to Aman, about five other employees work at the Inn. *See id.* at 24. Their duties include manning the front desk, housekeeping, and maintenance. *See id.*

Plaintiffs do not dispute that the Lake Inn is an older structure which has been in need of maintenance and repair from time to time. *See*, *e.g.*, A. Kaur Dep. at 66 (describing the Inn as "an old building" with "some issues"); Doc. 34-4 and Doc. 44-1 (engineering inspection reports, detailing items of concern). Nor do plaintiffs dispute that police have been called to the Inn to address various complaints. These include calls initiated by the owners about guests who were unruly or refusing to pay, as well as calls made by guests or citizens about possible unlawful activity occurring on the property, such as disorderly conduct and drug activity. *See* Barker Dep. at 32, 34–35; Pereira Dep. at 24–25; Harget Dep. at 28, 30. Police and other Village officials were also aware of complaints about bedbugs at the Inn. *See* Harget Dep. at 32; Adkins Dep. at 37. *See also* A. Kaur Dep. at 40–41 (testifying to bedbug activity in July 2022).

**C. Inspection of the Lake Inn on April 3, 2023**

On April 1 or 2, 2023, the Village's Code Enforcement Officer, Rex Adkins, received a complaint from an individual who had recently stayed at the Lake Inn. *See* Adkins Dep. at 31; Pereira Dep. at 29. The individual told Adkins that he had been "eaten up" by bedbugs while staying there. Adkins Dep. at 31. Officer Pereira also spoke to the individual, and a report was taken, along with photographs of the bedbug bites. *See* Pereira Dep. at 29–30. Plaintiffs do not have any reason to dispute the veracity of the complaint. *See* Singh Dep. at 39, 43.

With the report having been filed, the next step was for Adkins to conduct an inspection of the Inn. *See* Adkins Dep. at 33. On morning of April 3, 2023, Adkins met Chief Harget and two other officials – the zoning inspector and the Chief of the Fire Department – at the Village's office building. *See id.* Adkins's goal was to inspect about 50 percent of the rooms, and he hoped that having the assistance of the other officials would expedite the process and calm any tempers that may flare up. *See id.* at 34–35. According to the deposition testimony, Sonny could sometimes get upset and be difficult to deal with. *See id.* at 35; Harget Dep. at 32.

Gori was at the motel when the Village officials arrived. *See* A. Kaur Dep. at 44. Gori called Aman, who came immediately so that the pair could open the rooms for inspection. *See id.* at 46. Aman called Sonny, who was at home, and he said to "[l]et them do it," in reference to the officials wanting to do an inspection. Singh Dep. at 48. Aman recognized that the Village had a right to inspect the motel, but she was "kind of surprised" that Chief Harget came for the inspection because a police officer had not been present for past inspections. *See* A. Kaur Dep. at 47–48. Aman felt somewhat threatened and thought that it did not seem right that the police had come along for what initially was presented as a bedbug complaint. *See id.* at 45–48.

Aman and Gori cooperated in making the property available for inspection. *See* Harget Dep. at 46; Adkins Dep. at 36. The officials observed numerous code violations. Some violations related to the conditions observed inside the rooms. As Adkins described it:

> [S]ome of the rooms were not maintained in a good repair or a good sanitary condition, light switches that were not properly working or unsafe, the broken floor tiles in bathrooms that were sticking up, causing trip or hazards of being cut, baseboards that were molding, missing or falling off, threshold floor strips not secure and coming up. . . . There was hair, large quantities of hair on bathroom floors, toilets, lots – some areas that were overly stained, grime, dirt in tubs, toilets and faucets that were not working. Some of the floors had some unknown sticky substance on it . . . . [C]hairs in the rooms that were covered in stains. There were filthy dirty mattresses, some had blood stains and urine stains on them. There were also pest droppings on them also on the bed sheets that were also – some of them were stained and dirty, bedding that had burn marks, holes in it. Some of the rooms had strong odor or pet odors in them. There was some type of – appeared to be a pest control type substance that was crushed up on the floor around the walls of the baseboards and in the corners. As far as the pest infestation in the rooms were located, both live and dead bugs and the droppings. Those bugs, some of the ones that were noted were bedbugs, ants, roaches, spiders and flies.

*Id.* at 39–40. Some rooms also had smoke detectors which were not working. *See* Doc. 34-3 at PAGEID 660.

Exterior violations were also observed. These included unsanitary conditions, such as uncovered trash cans, uncovered buckets with cigarette butts in them, used tires and old charcoal grills being stored on the property, and rat bait stations being placed in locations visible to guests. *See* Adkins Dep. at 38–39. The exterior violations also included hazardous conditions and "structural" issues. *See id.* at 42; Harget Dep. at 46–47. These included: guardrails and handrails which were not attached or anchored, and thus not capable of properly resisting force or bearing weight; rusted and deteriorated structural support beams not capable of properly supporting a load; deteriorated concrete

adjoining the support beams; exterior stairways not in good repair; rotting wood trim; broken windows; and holes in exterior walls. *See* Doc. 34-3 at PAGEID 650–655 (violation notices).

Adkins and the zoning inspector determined that the Inn was unsafe and posed "immediate" dangers. *See* Adkins Dep. at 41–42; Harget Dep. at 47. They made the decision to order that the Inn be evacuated until the safety violations were remedied. *See* Adkins Dep. at 42–43; Harget Dep. at 47. Mayor Peterson was informed of the decision. *See* Harget Dep. at 47.

Aman was incredulous when Adkins first informed her that the Inn was being shut down. She did not think that Adkins had found any evidence of live bedbugs, but only traces of past activity. *See* A. Kaur Dep. at 49–50. Five days earlier, on March 29, 2023, a pest control company had performed regular monthly treatment services at the Inn. *See* Doc. 34-1 at PAGEID 635.

According to Adkins, Aman knew or should have known that the basis for shutting down the Inn was broader than bedbug concerns. Aman and Gori accompanied him and the other officials as they inspected the motel. *See* Adkins Dep. at 42. He alerted them to the issues that the officials were seeing "as we were going along." *Id.* He explained to Aman why guests needed to leave and "what needed to be done to remedy those immediate concerns." *Id.* at 43.

**D. Evacuation of the Lake Inn**

Shutting down the Inn meant that existing guests had to be notified and given assistance in making other arrangements. Chief Harget and the fire chief began to work with Aman and Gori to accomplish that task. *See* Adkins Dep. at 43–44. Chief Harget called Officers Barker and Pereira in to help. *See* Barker Dep. at 45; Pereira Dep. at 35. It was likely early-to-mid afternoon on April 3 at this point. *See* Barker Dep. at 45; A. Kaur Dep. at 56.

When Officers Barker and Pereira arrived at the Inn, Chief Harget told them that code enforcement had deemed the building to be unsafe and that guests would need to be told to leave. *See* Barker Dep. at 46. They started the process of going door-to-door to tell guests to gather their belongings and leave. *See id.* Chief Harget and the fire chief made calls, including to the Red Cross, to try to find assistance for guests who needed it.[1] *See* Pereira Dep. at 34–35. Aman and Gori went through paperwork to determine how many guests they had. They sent emails to guests about the

[1] The Inn was a budget motel, and some guests had been living there long-term and some had been keeping pets in their rooms. *See* Harget Dep. at 50. Chief Harget testified that the Red Cross could not offer assistance and about five guests had no means of finding another place to stay that night, so he decided not to immediately force them out. *See id.* at 49, 50, 54.

evacuation, and they also accompanied Officers Barker and Periera in going door-to-door. *See* Pereira Dep. at 35; Barker Dep. at 46.

**E. Aman is placed in Handcuffs by Officers Barker and Pereira**

According to Officer Barker and Pereira, Aman and Gori were upset about the Inn being evacuated. *See* Barker Dep. at 46; Pereira Dep. at 36. The Officers believed that their reaction was understandable. *See* Barker Dep. at 46 ("Obviously when, you know, you're running a business and you get told that you're shut down, you can't make any money, you're going to be upset. So obviously we understood they were upset."); Pereira Dep. at 36 ("They were visibly and understandably upset.").

But the Officers say the behavior of Aman and Gori reached the point of interfering with the evacuation process. They claim that Aman and Gori followed them and "verbally berated" them to the point of causing a disturbance and hindering their ability to do their jobs. *See* Barker Dep. at 46–47. This allegedly happened multiple times within the span of 30 to 60 minutes. *See id.* at 47. Officer Barker testified that "we kept advising them to go inside, you know, stop causing a disturbance, we get you're upset, we don't need anybody to be put in handcuffs, we don't need anybody charged, you know, we are trying to be understanding of your situation, but we have something we have to do." *Id.* at 46–47.

In the late afternoon, as the Officers were standing in the parking lot outside of the Inn's office, Aman came out and approached them. Before the Court on summary judgment are several pieces of evidence about the encounter. These include a police incident report, deposition testimony, and video footage from the Lake Inn's security camera and the Officers' body cams.

**1. Police Report and Deposition Testimony**

The Police Report states that Aman came out of the office and asked Officers Barker and Pereire "about when [the Inn] could reopen and what they would have to do about the tenants who ha[d] been staying there for several months to over a year." Doc. 1-1 at PAGEID 35. She was told that the Red Cross was being contacted to see if they could help. *See id.* Doc. 1-1 at PAGEID 37. Aman responded that it was not fair and that the Village was targeting the Lake Inn because it was owned and operated by Indian Americans. *See id.* Though Aman did not testify about this matter in her deposition, the Complaint's allegations are consistent with the Police Report's description of the initial phase of the encounter. *See* Compl., ¶ 28 (alleging that Aman approached the Officers to discuss the steps necessary to reopen the motel and that she said the Village officials were racists and targeting Sonny, Gori, and her because they were Indian Americans).

According to the Police Report and the deposition testimony of the Officers, Aman became argumentative and raised her voice. Aman stated that "this is what [the Village] wanted all along and that the Buckeye Lake Police have been nothing but bad." Doc. 1-1 at PAGEID 35. The Officers advised her to return to the front office and help guests get checked out. *See id.* But Aman "continued to argue and raise her voice," claiming the police were "pick[ing] on foreign people." *Id.* Officer Barker testified that Aman was "screaming" and "yelling" at them. Barker Dep. at 47. Officer Pereira testified that she was "constantly yelling." Pereira Dep. at 38. She was yelling that "this is wrong, you guys are wrong, this isn't right, you guys are harassing us," and "you guys are racist." Barker Dep. at 49. The Officers testified that they did not feel physically threatened by Aman's behavior, but that it was disruptive. *See* Barker Dep. at 49; Pereira Dep. at 38. The Officers again instructed Aman to stop yelling at them and to go back into the office to work on notifying and checking out guests. *See* Barker Dep. at 47; Pereira Dep. at 38–39; Doc. 1-1 at PAGEID 35.

After instructing Aman several times to stop arguing and return to the office, the Officers warned her that if she did not go back inside, they would place her in handcuffs because of her disorderly conduct. *See* Barker Dep. at 47; Doc. 1-1 at PAGEID 35, 37. Aman allegedly continued to argue and said, "[A]rrest me, go ahead." Barker Dep. at 47; Doc. 1-1 at PAGEID 35, 37.

The deposition testimony of Aman did not cover the encounter with much thoroughness.[2] But one point she was asked about was whether she told the Officers to arrest her. She denied that she asked or dared them to arrest her, but she admitted to saying that "you can arrest me." A. Kaur Dep. at 56–58. *See also* Compl., ¶ 30 (alleging that as she was walking back to the office, she said, "Arrest me"). Aman testified that in making the statement, she meant that "because you are a police officer, you can arrest anybody." A. Kaur Dep. at 57–58. According to Aman, Officer Barker was threatening to "arrest everybody" and said he had "enough handcuffs" to do so. *Id.*

The Officers decided to place Aman in handcuffs. They say they did so because she was not following orders. *See* Pereira Dep. at 39–40. According to Officer Barker's narrative in the Police Report:

> Officers then approached Kaur in an attempt to detain her. After realizing that officers were going to detain her, she attempted to retreat back toward the office and was grabbed by the coat by myself. I then advised her to place her hands behind her back. Kaur refused to bring her hands around and allow officers to place handcuffs on her. She instead attempted to break free of Officers grip and pull away from them. She continued to pull away and bring her hands away from her back to prevent officers

[2] Plaintiffs have not submitted an affidavit or declaration from Aman which speaks to the encounter. In opposing the motion for summary judgment, plaintiffs rely on the video footage.

> from detaining her. She was placed in a resistive hold to prevent her arms from moving away anymore than where they were. Ofc. Pereira was able to assist and retrieve her right arm and place a handcuff on it. After one arm was placed in handcuffs, officers then went to place the left arm in handcuffs. After several more moments of her attempting to remover her hands from officers grasp, Officers were able to retrieve her left arm and place the second handcuff on her. She was advised that she was detained for the time being.

Doc. 1-1 at PAGEID 35.

Officer Pereira's narrative stated:

> Ofc. Barker then approached her and ordered her to place her hands behind her back which she then attempted to retreat back into the office. Ofc. Barker then grabbed the back of the coat and told her to stop and place her hands behind her back. She then continued to pull her arms away and resist Ofc. Barker[']s attempts to detain her. Ofc. Barker continued to advise her to stop resisting, and that she was being detained.
>
> After seeing that she was continuing to resist Ofc. Barker, I approached and grabbed her right arm and advised her to stop resisting. She continued to try and break free, not listening to lawful orders by both officers. [A]fter a few moments Ofc. Barker and myself were able to place the handcuffs on her, with no injuries sustained to any party.

Doc. 1-1 at PAGEID 37.

Aman testified that the Officers used force to place her in handcuffs by grabbing her arms. *See* A. Kaur Dep. at 58–59. She admits that she was not physically harmed or injured during the sequence of events. *See id.* at 58. The Officers refused her request to talk to Gori. *See id.* at 57. When she asked to speak to her attorney, they told her that an "attorney is already being called," a statement which did not make sense to her *Id.*

The Officers escorted Aman to the back of a police cruiser. *See* Barker Dep. at 48. The narratives of both Officers in the Police Report state that Aman was advised of her Miranda rights. *See* Doc. 1-1 at PAGEID 35, 37. In their depositions, Officer Barker denied having read Miranda rights to her and Officer Pereira stated that he could not remember whether they had.[3] *See* Barker Dep. at 48; Pereira Dep. at 40. Officer Barker explained that he did not advise Aman of her Miranda rights because he did not plan to ask any incriminating questions of her. *See* Barker Dep. at 48–49.

---

[3] The video footage described below does not contain an instance where Miranda rights were read. In his deposition, Chief Harget said that he watched the footage and believed that the Officers erred when they stated in the Police Report that Miranda rights had been read. *See* Harget Dep. at 57. Officer Pereira testified that he did not know if the reading of Miranda rights occurred off camera. *See* Pereira Dep. at 43.

Once the Officers placed Aman in the back of the police cruiser, they told her to calm down. *See* Barker Dep. at 48; Pereira Dep. at 43. The Officers did not ask any questions of her. *See* A. Kaur Dep. at 60. They went and talked to Gori. *See* Barker Dep. at 48. Gori explained that Aman was a good person who was just under the stress of the situation, and she asked that Aman not be taken to jail. *See* Doc. 1-1 at PAGEID 35, 37. The Officers told Gori that Aman was not under arrest. *See id.*

After 10 to 15 minutes, the Officers went back to the cruiser and, upon getting Aman's agreement that she would be calm and not cause problems, they released her from the cruiser and the handcuffs. *See* Barker Dep. at 48; Pereira Dep. at 43; Harget Dep. at 53; A. Kaur Dep. at 60. The Officers then returned to helping with the evacuation process. *See* Pereira Dep. at 44–45.

Chief Harget testified that he was sitting in his police cruiser in the parking lot of the Inn when the encounter began. *See* Harget Dep. at 50–51. The encounter took place behind his cruiser. *See id.* at 51. He testified that the doors of his vehicle were shut and the windows were closed because he and the fire chief, who was in the passenger seat, were making calls. *See id.* He could not hear anything that Aman said. *See id.* He did hear "some yelling going on." *Id.* At some point, Chief Harget decided to exit the vehicle, but he "had no idea what was going on." *Id.* He saw that Officers Barker and Pereira were handcuffing Aman and that she was "kind of resisting." *Id.* at 51–52. He and the Officers told her to stop resisting. *See id.* at 52. She said that she wanted her attorney to be called, to which Chief Harget said that an attorney had been contacted. *See id.* (explaining that Adkins had talked to an attorney for the Lake Inn earlier that day). He saw the Officers escorting Aman and placing her in a nearby cruiser. *See id.* Chief Harget then walked over to talk to Gori, who was upset. *See id.* at 52–53. The situation soon calmed down. Aman was released from the cruiser and the handcuffs, and Chief Harget continued to try to find places for the Inn's guests to go for the night. *See id.* at 53–54. He saw Officers Barker and Pereira resume the task of going door-to-door. *See id.* at 54–55.

### 2. Video Footage

There are three video clips which captured portions of Aman's encounter with the Officers. These are labeled as Plaintiffs' Video Exhibits A, B, and C. But the Court will begin its review of the videos by describing another video clip, Plaintiffs' Video Exhibit D, which contains footage of the scene several minutes before the encounter started.

**a. Exhibit D**

Exhibit D is footage from a body camera worn by Officer Barker. The time stamp begins at 16:52:12 on April 3, 2023, and the clip is 6 minutes and 16 seconds in length.[4] The footage starts with Officer Barker in the parking lot walking towards the Inn's office. He enters the door, and Gori stands at the front desk and turns towards him. Gori terminates a phone call she was attempting to make, and Officer Barker asks, "Who's asking for them to sign something?" When Gori appears to not understand what he is referring to, Officer Barker explains that guests were signing a petition to oppose the evacuation. Gori agrees with Officer Barker that the guests have to leave. Officer Barker, who is joined by Officer Pereira at some point, explains that the guests were saying that Gori or Aman had told them to sign a petition. Gori indicates that she does not know what the guests were signing. She expresses that the situation is a difficult one for her and the Inn's guests, but her demeanor is calm and non-argumentative throughout the conversation.

At the 2 minute and 13 second mark, Officer Barker says "Ok" and turns and exits the office. He and Officer Pereira walk to a couple of guests who are standing in the parking lot. Officer Pereira engages in a discussion with them. The conversation seems to be about whether someone is owed money. Officer Barker then takes a cell phone call. On the call, he says that he has "already started" and done "the whole lower level, but there's some rooms that didn't open." As he is finishing the call, a police cruiser is approaching him in the parking lot.

At the 3 minute and 30 second mark, Chief Harget pulls up in his police cruiser, with the fire chief in the passenger seat. With the driver's side window down, Chief Harget stays in the cruiser and hands Officer Barker two bottles of water. Seeing and hearing the ongoing conversation between Officer Pereira and the two guests, Chief Harget asks, "So, do they owe them money?" From the statements made next by Chief Harget and Officer Barker, it appears to the Court that some of the guests had paid money in advance and now believed that Gori was refusing to give them a refund.

Chief Harget and Officer Barker discuss how the guests should sue the Inn to get their money back. They and the fire chief then discuss that some guests having been staying at the Inn for over a year and need help finding a place to go. The video clip ends with Chief Harget saying that "there's other hotels." The time stamp at the end of the clip is 16:58:28.

---

[4] The deposition testimony and the Police Report do not provide an exact time of when the encounter began or when Aman was handcuffed. As will be noted below, there are discrepancies in the time stamps among the video cameras. In any event, the time stamp of Exhibit D is consistent with the sense one gets from reading the depositions that the encounter occurred in the late afternoon.

**b. Exhibit A**

Exhibit A is security footage from the Inn. The footage is from a camera which is located above the entry to the front office and facing the parking lot. The office is on ground level, in the center of the building, with an exterior door to the parking lot. The time stamp at the start of the footage is 16:59:20, and the clip is 3 minutes and 43 seconds long.

The Court believes that the time stamps in Exhibits A and D likely do not align with one another, such that the gap from when Officer Barker's body cam footage ends in Exhibit D to when Exhibit A begins is likely more than 52 seconds. The Court reaches this belief based on when Exhibit A shows the moment that Officer Barker gives his handcuffs to Officer Pereira in Exhibit A (17:00:57) versus when the same moment is captured by Officer Barker's body cam in Exhibit C (17:05:17). Reconciling the discrepancy between the time stamps (of 4 minutes and 20 seconds) would lead to the conclusion that 5 minutes and 12 seconds elapsed between the end of Exhibit D and the start of Exhibit A. During the elapsed time, Chief Harget has pulled his cruiser forward by about a car length, the guests in the parking lot have dispersed, and Officer Pereira has joined Officer Barker in standing next to the cruiser.

The start of the footage shows Aman walking at a slow-to-moderate pace in the parking lot, moving away from the camera and toward the rear end of Chief Harget's cruiser. The cruiser is parked on a slant in the parking lot (in relation to the lines for the parking spaces), with its passenger side in full view of the camera. Officers Barker and Pereira are standing close to the driver's door of the cruiser, such that the cruiser is between the camera and the Officers. The Officers appear to have their attention fixed on Chief Harget, who is sitting in the driver's seat of the cruiser.

As Aman approaches the Officers, she says something – a word or two that is not discernible. The Officers notice Aman. Ten seconds into the video clip, she stops near the rear, driver's side bumper of the cruiser, and the Officers move towards her. The Court observes that Aman is not making any movements which would suggest that she is agitated or threatening.

The Officers and Aman begin a conversation. Their voices are faint and their words indiscernible. The volume of the Officer's voices can be heard slightly better than Aman's – probably because they are facing the camera more than she is. All three individuals are standing still and appear to be calm. This continues for about 32 seconds.

At time stamp 17:00:02, the footage freezes and picks back up at 17:00:10. Aman and the Officers are still talking near the rear of the cruiser. Aman has rotated her body, so that all three of them are somewhat facing the camera. Aman is wearing a coat and appears to have one hand in her

coat pocket and is holding a cell phone in the other hand. At 17:00:13, she starts walking away – in the direction of the front office – and she looks down at her phone. One of the Officer's voices can be heard slightly raised, and, after taking a few steps, Aman turns back and looks at them, at 17:00:17.

The sound of a pick-up truck driving nearby somewhat obscures the audio feed for about five seconds. One of the Officers can be heard in a raised voice, and Aman responds in a raised voice. The Court cannot say if they raised their voices out of agitation or because of the pick-up driving by. But one sign that the discussion was perhaps unpleasant at this point is that, as their voices are raised in volume, Officer Barker lifts his arm and points at Aman, and she, with cell phone in hand, waves her arm back at him.

At 17:00:24, Aman puts her arm down and starts walking away, towards the office. The sound from the pick-up subsides. Over the next several seconds, as she is walking away, Aman and Officer Barker continue to exchange words and talk over each other in what seems to be raised voices. The Court cannot discern what Aman is saying, except that she seems to be accusing the Officers of making things "difficult." Officer Barker can be heard to say, "Enough. Ok, that's fine. If everybody's not out, we'll start taking them to jail. I've got plenty of handcuffs." The time stamp is 17:00:31 when he finishes making this statement. While Officer Barker is making this statement, he paces towards the driver's door of Chief Harget's cruiser and then turns back towards the rear of the cruiser, and Aman stops walking away and turns back to look at the Officers. She is a car's length or two away from them at this point. Officer Pereira is still at the rear of the cruiser.

Aman responds, "Yeah, that's what you can do." Officer Pereira waves his arm in a motion that suggests he wants her to leave and go to the front office. Aman then takes a few steps in that direction. In a loud voice, Officer Barker says, "Enough, go inside," while pointing his arm at the office. At 17:00:35, Aman turns toward the Officers and says something that starts with, "That's what . . . ."

At 17:00:36, Officer Barker throws some papers to the ground and moves quickly towards Aman while saying, "Go inside and start doing what you need to do." While making this statement, he starts grabbing for his handcuffs. Aman stands still and says either, "So, arrest me," "No, arrest me," or "Go ahead, arrest me." Officer Pereira sees this unfold and turns on his body cam.[5] As Officer Barker gets a few feet from Aman with his handcuffs pulled out (and with Officer Pereira

---

[5] Exhibit B is Officer Pereira's body cam. The footage shows that his body cam retained a recording of video and audio beginning about 15 seconds before activation. The same is true of Officer Barker's body cam footage in Exhibit C.

following him, perhaps five to ten feet back), Aman turns and starts walking away from him and towards the office.

Officer Barker tells Aman to turn around, and at 17:00:41, grabs the hood of the back of her coat to stop her from walking away. Officer Barker then grabs her arms while repeating, "Turn around." Though Aman moves out of the bottom of the frame of view, it appears she keeps trying to walk once Officer Barker grabbed her arms. Officer Barker says, "Come here" as he moves out of the camera's view. Officer Pereira moves in towards them. Chief Harget's door opens and he steps out of his cruiser

With Aman and Officer Barker out of the view of the camera, Aman can be heard loudly stating, "For what?" at 17:00:45. Officer Barker repeats for her to turn around, and Officer Pereira exits the frame as she again asks, "For What?' Chief Harget walks towards them, and Aman's head starts to re-emerge into the frame at 17:00:48, facing Chief Harget. Officer Pereira can be heard to say, "Stop resisting," and Officer Barker says, "Enough."

Aman seems to become quiet at this point and stands still. Officer Barker is standing behind Aman with his left arm securing hers, but he seems to be unable to get her hands cuffed. Officer Pereira stands in front of Aman, with her cell phone now in his left hand, and comments, "You just asked him to arrest you." Officer Barker adds, "And I've told you enough, you're not listening." Using his right hand, he gives the handcuffs to Officer Pereira at 17:00:57 and then turns on his body cam. Officer Pereira takes the cuffs and places Aman's cell phone in his pocket. Chief Harget draws closer and stands in front of Aman. She says to them, "You are doing wrong, ok." Officers Barker and Pereira attempt to apply the cuffs with Aman's hands behind her back.

During the process of cuffing her hands, the Officer and Aman continue to exchange words (which are better heard in the body cam footage, Exhibits B and C, discussed below). The Officers appear to lock the cuffs by 17:01:28. Eight seconds later, at 17:01:36, all four individuals leave the frame as the Officers escort Aman towards a cruiser that is parked on the opposite side of the parking lot from where Chief Harget's cruiser is parked. The remainder of the video (about 1 minute and 28 seconds) shows the fire chief interacting with two guests.

**c. Exhibit B**

Exhibit B is footage from Officer Pereira's body cam. It begins with a time stamp of 16:04:46, and is clearly not aligned in time with either the Inn's security camera or Officer Barker's body cam. The clip is 10 minutes long. It begins at the point where Officer Barker says to Aman, "Ok, that's fine. If everybody's not out, we'll start taking them to jail. I've got plenty of handcuffs."

From the starting point of this clip until the moment Officer Barker locks the handcuffs, the footage helps fill in a few details that are not apparent from the Inn's security footage. Once Aman says, "Yeah, that's what you can do," Officer Perera twice tells Aman to "go inside." When Aman makes a statement that begins, "That's what," the footage does not clearly establish the rest of the sentence, but it sounds like, "That's what . . . saying." As Officer Barker steps towards Aman and says, "Go inside and start doing what you need to do," Officer Pereira rotates his body, such that the camera plainly shows that the driver's side window of Chief Harget's window is fully down and his arm is partially outside the car. When Aman says either, "So, arrest me," "No, arrest me," or "Go ahead, arrest me," Officer Pereira responds, "Alright, just asked for it."

At time stamp 16:05:19, Officer Barker has just handed the cuffs to Officer Pereira and can be seen activating his body cam (Exhibit C). Officer Barker tells Aman to "give me your arms." She is standing still and says, "You are doing wrong, ok." Officer Pereira retorts, "You literally asked him to arrest you" – the third time he makes a comment to that effect. She says, "I did not," and Officer Barker says, "And you didn't listen when I told you to go inside and do what you needed to do."

In the video, it appears that the Officers are having difficulty securing the handcuffs. Aman repeats, "You are doing wrong." Officer Pereira tells her to "quit resisting." Officer Barker then states, "Stop pulling" at a moment when her left hand and arm raise up, with his hand still grabbing that arm. Chief Harget can be heard to say, "Stop resisting." In the Court's view, a reasonable person could watch the footage and conclude that Aman is somewhat resisting the application of the handcuffs. A reasonable person could also watch the footage and conclude that the bulkiness of Aman's coat and hood possibly contributed to the seeming difficulty which the Officers had in securing the cuffs.

As Officer Barker is locking the cuffs, Aman states, "I need to talk to my attorney." Chief Harget responds, "Your attorney's already [been] called."

At time stamp 16:05:49, Officer Barker has just locked the handcuffs and puts the key away in his vest.[6] They start escorting Aman, who says, "I need to talk to her." Officer Pereira responds, "No, you need to come with us." As they walk towards a police cruiser parked at the end of the motel building, Aman repeats that she "need[s] to talk to her," and she can briefly be seen in the camera turning her head to the side. Officer Pereira says, "Quit resisting," and Officer Barker says, "You keep pulling away, you're going to keep stacking charges." In the Court's view, a reasonable person

[6] This moment corresponds with time stamps 17:01:28 in Exhibit A and 17:05:47 in Exhibit C.

could watch the footage and conclude that the pace at which the Officer Pereira is escorting Aman to the cruiser is relatively smooth and consistent – a fact which could be used to weigh against the Officers' statements that she is resisting and pulling away.

They reach the cruiser and Officer Barker starts opening the driver's door. At time stamp 16:06:12, Aman says, "This is wrong. You guys are doing this bullshit." Officer Pereira replies, "That's your opinion." Officer Barker then asks Aman if she has any weapons on her, and she responds that she does not.

Officer Barker goes somewhat outside of the camera's view and, after about 10 seconds elapse, he instructs Aman to have a seat in the cruiser. Aman gets in the rear seat of the cruiser and the door is closed at time stamp 16:06:41 (with 8 minutes and 5 seconds of footage left).

Officer Pereira walks back towards the front office. Chief Harget is in the parking lot speaking with Gori, who says something which is not fully discernable. Chief Harget can heard saying, "You can ask questions, but it went from . . . her asking a question to it being escalated." Officer Pereira hands Aman's cell phone to Gori. With Officer Barker joining them, Gori asks, "What happened, sir?" Officer Barker responds, "So, she came out asking questions, and we answered her questions. And then she started running her mouth. We told her knock it off and go inside and do what she needed to do. She continued to open her mouth, so now she's sitting in the back seat and we'll decide on charges." Officer Pereira adds that Aman "became argumentative," "started causing a scene," and "literally asked us to arrest her."

Chief Harget then tells Gori that they are going to "go door-to-door," get people "out of here," and "treat this as an emergency evacuation." Gori responds, "That's fine." Chief Harget comments that it puts Gori and Aman in a "bad spot" but that the Inn's problems are "Sonny's doing." Chief Harget then points towards the cruiser with Aman in it and says, "But the reason she's in custody is because she was not cooperative with these officers."

Gori states that they were "upset" and not expecting the Inn to be shut down. Chief Harget explains that the police did not expect it either and it was code enforcement's decision to shut down the Inn. Gori goes on to say that Aman was "just upset today" and "has never done anything," and she asks Chief Harget to give Aman "a break." Officer Barker states that Aman needs to "sit in there for a second and calm down before I go talk to her."

The fire chief joins the group. The discussion turns to such matters as whether the Red Cross can help guests get moved out of the Inn and the need for guests to receive their money back. Chief

Harget later reiterates that guests need to be evacuated and he comments that the Inn has a lot of problems which need to be addressed.

At time stamp 16:12:18, Officer Pereira turns his body and it appears that Officer Barker is no longer standing with them. At 16:13:05, Chief Harget points with his arm (apparently in Aman's direction) and says, "She's out now because you were respectful, so thank you." Aman is not readily visible in the video.

Chief Harget and the fire chief explain to Gori that they need a key card to go door-to-door and make sure every guest is out. They discuss again the likelihood that some guests will demand money back before they leave. The clip ends with further discussion about getting guests moved out.

**d. Exhibit C**

Exhibit C is footage from Officer Barker's body cam. It begins with a time stamp of 17:05:04 and is 10 minutes long. Its time stamp is not aligned with either Exhibits A or B. The footage begins as Officer Barker is attempting to cuff Aman. He passes the cuffs to Officer Pereira 13 seconds into the clip, at time stamp 17:05:17.

Given that Officer Barker is immediately behind Aman, much of the initial footage is of the back of her coat. But the footage does add some details for consideration. In the exchange where both Officers and Chief Harget tell Aman to stop resisting or pulling, a reasonable person could watch the footage from Exhibit C and conclude that Aman is perhaps attempting to free her left arm from Officer Barker's grasp. About 18 seconds later (time stamp 17:05:51), once the Officers start escorting Aman and she says (perhaps yells), "I need to talk to her," it appears as though Aman leans to the side, towards where Gori would be in the office. And the walk to the cruiser seems to be less smooth than what it appears from Officer Pereira's body cam in Exhibit B.

Once they have reached the cruiser and Officer Barker goes mostly out of the frame of Officer Pereira's body cam, Exhibit C shows that Officer Barker is using a wand to detect if Aman has any weapons. At time stamp 17:06:35, Aman gets into the back of the cruiser and Officer Pereira closes the door. The window to the door is fully closed, and there are vertical metal security bars on the inside of the rear windows.

Officer Barker follows Officer Pereira in joining Chief Harget's discussion with Gori. At time stamp 17:10:57, Officer Barker turns and starts walking back to the cruiser. Twelve seconds later, he opens the rear door and asks Aman, "Ok. Are we calm now? Are we relaxed?" Aman answers, "Yes." Officer Barker then says there will be no charges filed against her. He adds, "When I tell you, 'Enough,' it's got to stop."

Officer Barker explains to Aman that "everybody here" is trying help figure out how to move the guests. Officer Barker then says, "But you can't do that." Aman looks down and appears to get somewhat emotional. He states that the officers are trying to give Aman and Gori time to "figure out what you need to do. . . . But we're not going to sit there and argue back and forth. We're not going to cause a scene. We're not going to have issues." Aman indicates that she understands. Officer Barker states that he is going to release her but that she cannot get into an argument with him.

Officer Barker instructs Aman to step out of the cruiser. At 17:12:45, she is out of the cruiser and released from the handcuffs. This occurs about 6 minutes and 10 seconds after she was put in the back of the cruiser (time stamp 17:06:35) and about 6 minutes and 58 seconds after Officer Barker locked her cuffs (17:05:47). Reconciling the time stamp difference between Exhibits A and C (as explained above), the Court estimates that 7 minutes and 44 seconds elapsed from when Officer Barker first apprehended Aman, by grabbing the hood of her coat, until she was released from the car and handcuffs.[7]

Aman walks slowly towards the office, and Officer Barker follows. Chief Harget can be heard saying to Gori, "She's out now because you were respectful, so thank you." It appears that Aman goes into the office.

### F. Towed Vehicles

According to the Complaint, Officer Barker came to the Inn on the next day, April 4, 2023, at 9:20 a.m. He allegedly placed warning notices on three vehicles belonging to plaintiffs. The notices stated that the vehicles would be impounded if not removed within 24 hours. The vehicles were allegedly towed before 8:00 a.m. on April 5.

Defendants have submitted evidence in response to these allegations. Officer Barker testified that he was in charge of the impound lot. *See* Barker Dep. at 15, 59. He testified that an unspecified number of cars were tagged as abandoned vehicles at the Lake Inn on April 3. *See id.* at 59–60. They were considered to be abandoned because they did not have license plates, had not moved for 72 hours, and multiple attempts to contact the owner(s) had been made. *See id.* at 60. To Officer Barker's knowledge, none of the vehicles were impounded. *See id.* at 59.

---

[7] The factfinder at trial would be free to make its own time estimates and weigh them against the testimony that Aman was in the cruiser for 10 or 15 minutes. *See* A. Kaur Dep. at 60; Harget Dep. at 53. Any reliance on the time stamps of the various cameras would be premised on the assumption that the cameras accurately kept time.

Aman testified in her deposition that on an unspecified date, four or five vehicles were towed away from the Inn. *See* A. Kaur Dep. at 61. Aman's car was not one of vehicles towed. *See id.* Sonny's truck was towed, along with the cars of several guests. *See id.* Aman testified that she did not witness the cars being towed, but was told they had been by Gori.[8] *See id.* at 61–62. She stated that the vehicles were towed after less than 24 hours' notice. *See id.* at 61.

Sonny testified that he had a truck parked at the Inn which received a warning notice at 9:00 a.m. on April 3, 2023. *See* Singh Dep. at 51–54. The notice gave a 24 hour period in which to move the truck. *See id.* at 51. His truck was towed on April 4 at 8:20 a.m., along with two other vehicles belonging to guests. *See id.* at 52–54. The towing was done under the supervision of a police officer with the first name of Matt. *See id.* at 52. Sonny testified that he never tried to get his truck from the impound lot because he did not want to be "dealing with the police." *Id.* at 54.

### G. Post-Inspection Events

#### 1. Notices of Code Violations

On April 5, 2023, legal counsel for the Lake Inn emailed Adkins to request that Adkins provide him with copies of reports or notices of the code violations found at the Inn on April 3. *See* Doc. 1-1 at PAGEID 40. Counsel also informed Adkins that Aman was in the process of scheduling an exterminator to visit the property.

Adkins forwarded the email to the attorney for the Village of Buckeye Lake, in order to make him aware of the communication from the Inn's lawyer and to seek input on the level of specificity to be used in issuing the notices of code violations. *See* Doc. 44-3; Adkins Dep. at 44–45. Adkins testified that his intent in issuing the notices was "to seek compliance to solve the problem." *Id.* at 45. Adkins did not intend to "get specific by room," as one might if one were seeking to "compile a bunch of criminal citations on someone." *Id.*

On April 13, 2023, the Village issued 14 notices of code violations to the Lake Inn. *See* Doc. 34-3. The notices all concerned the violations observed by Adkins during the April 3 inspection. Each notice stated that it was not a citation and that the violations should be resolved before May 15, 2023. *See id.* The content of the notices reflected Adkins's desire to make them general. That is, there was not a notice for each and every discrete instance of a code violation. Rather, each notice concerned a

---

[8] The record does not contain a deposition, affidavit, or declaration from Gori.

particular Village Code provision, and multiple violations of a provision were joined into one notice.[9] Thus, each notice specified the Village Code provision which had been violated, the nature of the violation(s), and the actions necessary to resolve the violation(s). For instance, one notice concerned the Code provision relating to the condition of interior structures. *See* Doc. 34-3 at PAGEID 657. The notice recited all of the violations which had been found of that particular provision. *See id.* (the list included broken light switches, busted bathroom floor tile, moldy baseboards, etc.); *see also id.* at PAGEID 647 (notice regarding exterior sanitary conditions), PAGEID 652 (structural members), PAGEID 655 (handrails and guards), PAGEID 658 (infestation), PAGEID 660 (fire protection systems).

On April 18, legal counsel for the Inn emailed the Village's attorney stating that the Inn wished to appeal the notices of violations. *See* Doc. 1-1 at PAGEID 58. The email noted that the Inn had been treated for bedbugs and that progress was being made on the other violations. *See id.*; *see also* Doc. 35-1 (invoice showing that the Inn was treated for bedbugs on April 15, 2023 and that two live bedbugs were found in one of the rooms).

The record provides no evidence showing that plaintiffs received a hearing on their appeal of the notices of violation. In an April 20, 2023 email string among Village officials, Mayor Peterson was told that under the International Property Maintenance Code (IPMC), as adopted by Village Ordinance, she was required to select at least three individuals who would serve as the voting members on a board to hear the appeal. *See* Doc. 1-1 at PAGEID 65; *see also* 2018 IPMC § 111.2 (providing that the chief appointing authority shall appoint at least three individuals who will comprise the voting members of the board of appeals). The Mayor identified two individuals whom she wished to appoint. Adkins explained in response that there needed to be three members and asked the Mayor to let him know "[w]hen you create this Board." Doc. 1-1 at PAGEID 65. Adkins stated that pursuant to the Code he would serve as a non-voting member and that once the board was created, he would "go over the rules" with them. *Id.*

Mayor Peterson identified a third individual to serve on the appeals board. *See* Peterson Dep. at 45–46. She spoke with all three individuals to confirm they were willing to serve. *See id.* at 44. She let Adkins know of the third individual, and it is her belief that Adkins then spoke with the three individuals she had named to serve on the appeals board. *See id.* at 46. Mayor Peterson testified that she was unaware of whether the board ever met to hear plaintiffs' appeal. *See id.* at 44.

---

[9] The Village has adopted the International Property Maintenance Code. *See* Village of Buckeye Lake Ordinances 2018-15, 2022-55, 2023-14.

When asked in his deposition if he appealed any of the notices of violations, Sonny did not answer the question directly. *See* Singh Dep. at 61. Instead he answered that he had "already fixed" all of the problems at issue in the notices, at least on the first floor of the Inn. *See id.* He also testified that he had not received any further notices of violations. *See id.*

**2. Reopening of the Inn**

In her deposition, Aman testified that she did not believe there were any problems identified in the notices that did not actually need to be fixed. *See* A. Kaur Dep. at 66–67. Sonny similarly testified that he did not believe there was anything false in the notices. *See* Singh Dep. at 57.

The Inn retained an engineering firm to conduct a site inspection of exterior components of the building. *See* Singh Dep. at 57–58; A. Kaur Dep. at 67. The firm issued a report on April 9, 2023. *See* Doc. 34-4. The report found numerous issues, including loose handrails, corroded metal components, degraded and corroded stairs and stairwells, corroded metal facia around balconies, warped soffits, broken concrete, cracks in mortar joints, loose mortar, improperly tuck pointed bricks below stairwells, rotted and loose wood, peeling and missing paint, exposed electrical wiring, furniture blocking exterior walkways and balconies, and uncovered fire extinguishers. *See id.*

Sonny testified that he believed that all of the issues identified in the April 9, 2023 report were accurate. *See* Singh Dep. at 58–59. Aman also testified that she believed the report was accurate. *See* A. Kaur Dep. at 67–70. It is unclear from the record exactly what work was performed at the Inn. In any event, Sonny testified that the problems identified in the notices of violations were fixed on the first floor. *See* Singh Dep. at 61. Aman testified that they repaired the problems which were identified in the April 9 report. *See* A. Kaur Dep. at 70.

At the request of the Inn's legal counsel, Adkins conducted an inspection in late April 2023. *See* Adkins Dep. at 47; A. Kaur Dep. at 70–72; Peterson Dep. at 58–59. Though the Inn was still "in the process of remedying several of the violations," Adkins allowed the Inn to reopen its first floor to guests. *See* Adkins Dep. at 47; A. Kaur Dep. at 70–71. Aman testified that the Inn reopened on April 27 or 28. *See* Kaur Dep. at 72.

The Inn retained a structural engineering firm to inspect the second floor walkways of the motel. *See* Singh Dep. at 59; A. Kaur Dep. at 70. As detailed in a July 10, 2023 report, the firm observed many concerns, including "significant corrosion" of the steel framing of the walkways and "rusting and deterioration" of the stairs. Doc. 44-1 at PAGEID 828. The report found that "significant re-work and repair" was "necessary." *Id.* Aman testified that the second floor of the Inn

remains closed and they have not pursued reopening it. *See* A. Kaur Dep. at 71–74; *accord* Singh Dep. at 59–60.

**H. Mayor Peterson**

The Complaint alleges that Mayor Peterson directed an effort which "targeted" the Inn's owners and employees. Compl., p. 2. The Court now turns to evidence pertaining to Mayor Peterson.

Both Chief Harget and Adkins testified that Mayor Peterson was their direct superior. *See* Harget Dep. at 25–26; Adkins Dep. at 21. Adkins testified that he advised the Mayor that he would be conducting an inspection of the Inn on April 3. *See* Adkins Dep. at 27–28. The Mayor did not give Adkins any instructions or direction about the inspection, nor did she express a desire to shut the Inn down. *See id.* at 28–29. Chief Harget testified that the Mayor did not express to him a desire to shut the Inn down. *See* Harget Dep. at 56. Mayor Peterson testified that she did not give input into what violations the Inn should be cited for in the notices of violations. *See* Peterson Dep. at 57.

On the evening of April 3, 2023, after the inspection had been conducted, Adkins informed Mayor Peterson that the Inn had been shut down. *See* Adkins Dep. at 45–46. The Mayor thanked him for letting her know and said that she would make the members of the Village Council aware of the situation. *See id.* at 46.

Adkins copied the Mayor when he forwarded the April 5, 2023 email (from the Inn's attorney, asking for copies of the violation notices) to the Village attorney. She responded to Adkins and stated, "My request is to do everything possible to prevent them from reopening and continue to operate an unsafe and illegal facility in our community." Doc. 44-3.

On April 9, 2023, Mayor Peterson sent an email to Adkins stating that Sonny was hiring tenants to help clean up the Inn. Doc. 1-1 at PAGEID 62. She emphasized that Sonny "needs to hire professional cleaners who deal with bedbugs and other issues." *Id.* The Mayor testified in her deposition that she personally observed tenants cleaning the rooms when she drove by the property. *See* Peterson Dep. at 39–41.

On April 16, Mayor Peterson emailed the Village attorney and said that the Inn "can't open until the village sees" statements from a "professional exterminator" and a "professional cleaner." *Id.* at PAGEID 61. She added, "If this is not verified they will not be operating at any level." *Id.*

On April 21, Adkins sent an email to Mayor Peterson and other Village officials. It stated that the Inn had not obtained permits for "the work they are doing." Doc. 1-1 at PAGEID 63. It is unclear from the record whether "the work they are doing" referred to the repairs at the Inn or to a separate issue relating to an apartment which Sonny and Gori were creating within the Inn's structure.

*See* Adkins Dep. at 52–53; Peterson Dep. at 49; A. Kaur Dep. at 52. Mayor Peterson responded to the whole group, "Thank you another violation!!" Doc. 1-1 at PAGEID 63.

When Adkins conducted the follow-up inspection in late April 2023, Mayor Peterson was present at the Inn. *See* Adkins Dep. at 48; Peterson Dep. at 58–59. Peterson testified that she was not involved in the decisions to reopen the first floor or to keep the second floor closed. *See* Peterson Dep. at 58–59.

In early June 2023, Adkins informed Mayor Peterson of a complaint that there was a "junk RV" at the Inn. *See id.* at 47. The Mayor wrote in a June 2 email to Adkins that the Inn was "causing many issues within my community, and I might add I'm getting tired of the kid glove approach." *Id.* She expressed frustration about the Inn not keeping a record of its guests, as well as about guests improperly staying for extended periods of time and there being "illegal activity" there. *Id.* She stated that the situation was "unacceptable" and if something was not done, "we will have to take a different approach." *Id.* Mayor Peterson testified that she and other Village officials received many calls and complaints about the Inn. *See id.* at 48–49.

On August 25, 2023, a structural engineer issued a report regarding the balcony structure of the Inn. *See* Doc. 34-2. The report stated that Mayor Peterson had called the structural engineer and requested that a site visit be conducted of the second floor balconies. *See id.* at PAGEID 640. The site visit occurred on April 27, 2023, according to the report. *See id.* The report detailed many areas of concerns with the balcony structure and concluded that it was "in an accelerated state of disrepair and require[s] corrective action." *Id.* at PAGEID 641.

## II. Causes of Action

Plaintiffs filed a Complaint bringing eighteen causes of action. In response to defendants' motion for summary judgment, plaintiffs have conceded that three of their claims (Counts Eight, Nine, and Ten) are duplicative of, and subsumed by, other claims. *See* Doc. 44, p. 6 n.1. Plaintiffs have also conceded that defendants are entitled to qualified immunity with respect to Counts Twelve and Thirteen. *See id.* at p. 24 n.4. Thirteen causes of action remain.

The first three claims are for alleged violations of Aman's rights under the First Amendment to the United States Constitution. In Counts One and Two, the Complaint alleges that when Officers Barker and Pereira apprehended Aman, they did so in retaliation against her asking about the process of reopening the Inn and her protesting the decision to shut down the Inn as stemming from racism.

Count Three asserts a First Amendment retaliation claim against the Village and alleges that Mayor Peterson orchestrated the shutting down of the Inn, which allegedly in turn led to the arrest of Aman.

The next three claims are for alleged violations of Aman's rights under the Fourth Amendment. In Counts Four and Five, the Complaint alleges that Officers Barker and Pereira unreasonably seized Aman without cause. Count Six asserts an unreasonable seizure claim against the Village and alleges that the seizure of Aman occurred pursuant to a policy or custom of the Village or at the direction of the Mayor.

Count Seven asserts a claim against Chief Harget for failure to intervene in the alleged unreasonable seizure of Aman.

Counts Eleven and Fourteen bring claims under the Due Process Clause of the Fourteenth Amendment. In Count Eleven, plaintiffs AS Hotel and Sonny and Gori allege that they were deprived of their property interest in the Inn when it was shut down. The closure of the Inn allegedly occurred without adequate pre- or post-deprivation process. In Count Fourteen, the individual plaintiffs allege that they were improperly deprived of their property interests in their vehicles when those vehicles were towed from the Inn.

In Count Fifteen, the Complaint asserts a claim against all defendants for alleged violations of Sonny and Gori's substantive due process rights. The Complaint alleges that defendants acted in arbitrary and capricious fashion in closing the Inn.

Count Sixteen is for conspiracy to interfere with civil rights. *See* 42 U.S.C. § 1985(3). The Complaint alleges that defendants conspired to deprive the individual plaintiffs of their civil rights because of discriminatory animus against plaintiffs' national origin.

The final two claims are brought under the Equal Protection Clause of the Fourteenth Amendment. The Complaint alleges that the individual plaintiffs were subjected to discriminatory treatment because of their national origin (Count Seventeen) and race (Count Eighteen).

Defendants have moved for summary judgement on all claims.

## III. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by

demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## IV. Discussion

### A. Aman's First and Fourth Amendment Claims (Counts One to Seven)

#### 1. Unreasonable Seizure Claims Against Officers Barker and Pereira (Counts Four and Five)

The Complaint alleges that Officers Barker and Pereira arrested Aman without probable cause in violation of the Fourth Amendment. She contends that during her encounter with the Officers on April 3, 2023, she did not engage in any conduct justifying arrest. According to Aman, she asked the Officers what would need to be done to reopen the Inn and expressed her belief that the Inn was

being targeted by Village officials because it was owned and operated by Indian Americans. Aman argues that the video evidence demonstrates that she was arrested and that she did not engage in threatening conduct towards the Officers.

Defendants argue in their motion for summary judgment that they detained, but did not arrest, Aman when they placed her in handcuffs and put her in the police cruiser. They contend that Aman screamed and yelled at Officers Barker and Pereira and refused to comply with their command to go back inside the Inn's front office. They argue that the detention was warranted because Aman's disruptive and disorderly behavior prevented Officers Barker and Pereira from carrying out their jobs of evacuating the Inn.

The threshold question to be addressed is whether the Officers' seizure of Aman should be treated as an arrest or a detention. This matters because of the different levels of justification required. *See United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991) ("A significant legal difference exists between securing a detainee and arresting a suspect."). An arrest must be supported by probable cause to believe that the individual in question has committed or is committing an offense. *See Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020). A detention, or *Terry* stop, can be conducted for investigatory purposes or to protect officer safety when supported by a reasonable suspicion that criminal activity might be "afoot." *United States v. Burns*, 298 F.3d 523, 541 (6th Cir. 2002); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.").

There is no "litmus test to determine when a *Terry* stop becomes an arrest." *Richardson*, 949 F.2d at 856. A court must make a case-by-case inquiry into the "nature of the restraints placed on an individual's liberty." *Id.* "Courts within the Sixth Circuit consider the following three factors to distinguish a *Terry* stop from an arrest: (1) the conduct of the police; (2) the characteristics of the citizen; and (3) the physical surroundings of the encounter." *Cort v. Thorp*, No. 2:23-CV-917, 2025 WL 2550010, at *8 (S.D. Ohio Sept. 4, 2025) (citing *United States v. Grant*, 920 F.2d 376 (6th Cir. 1990)). The determination is an objective one and ultimately focuses on whether "a reasonable person in the [plaintiff's] position would have felt that he was under arrest or was otherwise deprived of his freedom of action in any significant way." *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (internal quotation and citation omitted).

When viewing the facts in a light most favorable to the plaintiff, the Court finds that one could reasonably conclude that the Officers' handcuffing of Aman and placing her in the cruiser constituted

an arrest.[10] The encounter began with Aman voluntarily approaching Officers Barker and Pereira. The initial phase of the encounter lasted about 45 seconds, with Aman standing near the Officers and next to Chief Harget's cruiser. As viewed from the Inn's security camera, she then began walking away from the Officers and towards the Inn's front office. *See* Video Ex. A, time stamp 17:00:13. After a brief and perhaps heated exchange between Aman and Officer Barker, Aman began again to walk away from the Officers. She stopped her progress towards the office when Officer Barker threatened to take people to "jail" in "handcuffs."

Aman momentarily moved again towards the office as Officer Barker instructed her, "Enough, go inside," and pointed to the office. Even while repeating his instruction for Aman to "[g]o inside and start doing what you need to do," Officer Barker stopped her progress towards the office when he tossed his paperwork to the ground, moved quickly towards her, pulled out a set of handcuffs, and grabbed the hood of her coat from behind. Upon Officer Barker grabbing Aman's hood, her freedom of movement plainly became restricted. And the restriction on movement increased as both Officers physically restrained Aman by grabbing her arms in order to apply the handcuffs.

The Court recognizes that the placement of a citizen in handcuffs does not automatically turn a *Terry* stop into an arrest. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 837 (6th Cir. 2005). However, it does "'substantially aggravate[] the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop.'" *Id.* (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)). The handcuffing of Aman must be given significant weight as the Court considers the circumstances, especially in light of both Officers' testimony that they did not feel physically threatened by Aman's behavior and in light of this not being a situation where the Officers were concerned about Aman being a flight risk. *Cf. United States v. Foster*, 376 F.3d 577, 587–88 (6th Cir. 2004) (the use of handcuffs "does not exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution") (internal alteration and quotation marks omitted).

Other factors could be viewed as supporting a conclusion that the seizure was an arrest. One is that Officer Pereira seized Aman's cell phone from her hand and placed it in his pocket, which would seem to be unnecessary if he were simply detaining her for the purpose of calming her down.[11] Another is that Aman reacted to being restrained by asking to talk to her lawyer. A reasonable person

---

[10] The Court reserves for trial a final determination as to whether an arrest or *Terry* stop took place.

[11] Defendants do not claim that Aman used her phone in a way which contributed to her disruptive behavior.

who thought they were merely being detained might not so immediately ask for a lawyer. The Officers did nothing to dispel her belief that she was in a situation for which a lawyer was needed. Indeed, Chief Harget responded by telling her that her attorney had already been called. An additional consideration – from the viewpoint of a person in Aman's position – is that Officer Barker indicated that she was being charged with an offense. He told her, "You keep pulling away, you're going to keep stacking charges." His indication that she was being charged (and could face more charges) could have created a reasonable impression in Aman's mind that Officer Barker believed she had committed a crime and thus was arresting her. This is particularly so when paired with Officer Barker's earlier statement to Aman about taking people to jail in handcuffs.

Beyond the handcuffing, the restriction on Aman's freedom of movement was reinforced by the physical presence of Chief Harget. He came and stood just a few feet in front of Aman as the Officers handcuffed Aman. It was reinforced again as the Officers refused Aman's request to talk to Gori and told her, "No, you need to come with us." She was taken involuntarily to a police cruiser at the other end of the parking lot and placed in the rear seat.

Aman was subjected to a weapons check before she was placed in the cruiser. When the Officers closed the door to the rear seat of the cruiser, they put the window up. There were police security bars on the inside of the windows of the rear doors. The Officers walked away from Aman in the cruiser without informing her what they were doing next. They did not, for instance, tell her that they were giving her a few minutes to calm down and would be back to check on her. She remained in the back seat of the cruiser for at least six minutes and perhaps more than ten, depending on which evidence is credited (the video footage time stamps or the testimony of Aman and Chief Harget). During this time, Aman had no way to anticipate how long she would be kept in handcuffs in the cruiser or what would happen to her next. When viewing Officer Barker's body cam, a reasonable person could observe Aman's countenance as he returned to the cruiser and conclude that she was truly apprehensive as to what might happen next. *See* Video Ex. C, time stamp 17:11:11.

Finally, the Officers made statements that day about what had happened, and those could be weighed in favor of viewing the encounter as an arrest. The record is unclear as to whether the Officers actually read Aman her Miranda rights, but both Officers at least found it appropriate to state in the Police Report that they had done so. This is some evidence that they perceived the situation as one which warranted the reading of Miranda rights. Moreover, Officer Pereira repeatedly attempted to justify the handcuffing by stating to both Aman and Gori that Aman had "literally asked us to arrest her." When speaking to Gori while Aman was in the cruiser, Chief Harget stated that Aman was "in

custody," and Officer Barker told Gori that they were deciding on "charges" to bring against Aman. The Officers' and Chief's use of the terms "arrest," "in custody," and "charges" could be used to conclude that they perceived the situation to be something more than a *Terry* stop or brief detention.

In sum, there are facts at the summary judgment stage which support a finding that the Officers significantly restrained Aman's liberty for more than a brief stop and conducted an arrest.

Turning to a justification for Aman's arrest, the defendants do not argue in their briefing that they had probable cause to arrest her. Instead, defendants rely solely on the argument that she was detained, not arrested.[12] This alone is sufficient reason to deny the motion for summary judgment as to Counts Four and Five.

Even if the Court were to find that the encounter was a *Terry* stop, a jury could conclude that the Officers' conduct in handcuffing Aman and placing her in the cruiser was not justified. *See Kowolonek v. Moore*, 463 Fed. App'x 531, 536–37 (6th Cir. 2012) ("[W]here officer safety and suspect flight are of little concern, we have found handcuffing and detention unreasonable under *Terry*."). Defendants contend that Aman engaged in disorderly conduct by berating and screaming at the Officers and by refusing to comply with their command to go inside to the Inn's office. *See id.* at 537 (holding that a brief detention could be justified where an individual was "resistant" and "angry"). But a person viewing the video footage in a light favorable to plaintiff could reasonably find that Aman posed no threat and remained relatively calm, especially in comparison to Office Barker, who raised his voice, threatened to take people to jail in handcuffs, and threw papers to the ground. A factfinder could determine that Aman was in fact attempting to return to the office, as the Officers had told her to do, but that the Officers' own conduct, including Officer Barker's provocative statements and his grabbing of Aman's hood, is what halted Aman's progress towards returning to the office.

The Court thus finds that defendants are not entitled to summary judgment on Counts Four and Five.[13]

---

[12] In passing, defendants suggest that Aman consented to being seized by telling the Officers to "arrest me." Doc. 35 at PAGEID 681. A factfinder could watch the video footage of the interaction and conclude from Aman's body language and tone of voice that she made the statement sarcastically or in protest and did not genuinely give consent to being arrested.

[13] The motion for summary judgment argues that defendants are entitled to qualified immunity. *See Sumpter v. Wayne County*, 868 F.3d 473, 480 (6th Cir. 2017). However, the asserted basis for qualified immunity is that the Officers' seizure of Aman was warranted, not that Aman's rights were not clearly established. Because there is a genuine dispute of fact as to whether the seizure was justified, the Court denies the qualified immunity prong of the motion.

### 2. First Amendment Retaliation Claims Against Officers Barker and Pereira (Counts One and Two)

The Complaint alleges that Officers Barker and Pereira arrested Aman in retaliation for her asking about the process of reopening the Inn and asserting that the Inn was being unfairly shut down because of the race and nationality of its owners and manager.

To support a First Amendment retaliation claim, a plaintiff must demonstrate that: (1) she "engaged in constitutionally protected speech," (2) she "suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech," and (3) "the protected speech was a substantial or motivating factor in the decision to take the adverse action." *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011). In the context of an alleged retaliatory arrest, plaintiff must also "prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019).

The first two elements of plaintiff's claims are not presently at issue. Defendants' motion rests on the argument that the motivating factor in the Officers' decision to seize Aman was her disruptive behavior and not her speech. Relatedly, defendants argue that because they had sufficient cause to detain Aman, the seizure was not retaliatory.

The Court finds that there is a genuine issue of material fact as to the Officers' motivation for seizing Aman. Two considerations guide the Court's conclusion. First, a factfinder could discredit the reasons offered by defendants for seizing Aman. As stated above, when viewing the video footage in a light most favorable to plaintiff, a factfinder could determine that Aman was not threatening, berating, or harassing the Officers. After her initial 45 second discussion with the Officers, Aman appeared to have been generally trying to head back to the office.

Second, a factfinder could also reject the premise that Aman's conduct somehow kept the Officers from doing their jobs of evacuating the Inn. When Aman came out to talk to the Officers, the footage shows that they were standing by Chief Harget's cruiser. It appears as though she did not catch them at a time when they were actively engaged in evacuating guests. The scene is much the same as it was more than five minutes earlier when Officer Barker's body cam shows that he was standing next to the cruiser and that he and Chief Harget were discussing how the guests should sue the Inn to get their money back. *See* Video Ex. D, time stamp 16:56:03. Prior to this, Officer Barker stated that he already done "the whole lower level" in notifying guests that the Inn was being shut down. Though the Court does not discount defendants' general assertion that the Officers still had work to do to see that all guests had left the premises, a factfinder could determine that the Officers

were not urgently involved in an evacuation when Aman approached them. Given that the record indicates that the process of shutting down the Inn unfolded over many hours, a factfinder could find that Aman's 45 second discussion with the Officers did not truly disrupt their ability to perform their jobs.

Of course, plaintiff must still demonstrate a causal link between her protected speech and the retaliatory action. Demonstrating that an arrest or detention is unjustified, without more, does not prove a retaliation claim. But defendants' only argument in their motion is that Aman's disruptive behavior was the reason for her seizure. For purposes of advancing the claim to trial, the Court finds that the Officers' behavior (as seen on Video Exhibit A) immediately after Aman asked her questions and made her assertion of racism is sufficient to support an inference of causality.[14] One could view the Officers as becoming agitated by what Aman said. Both motioned with their arms at her – Officer Barker pointed; Officer Pereira waved for her to go away. Officer Pereira kicked a rock on the ground. Officer Barker raised his voice, paced back and forth, threatened to take people to jail, and threw his paperwork to the ground. A few seconds later, the Officers seized her. And later, when they were talking to Gori, Officer Barker explained that they seized Aman because she was "running her mouth." Video Ex. B, time stamp 16:07:07. This evidence is sufficient to clear the summary judgment hurdle.

Accordingly, the Court finds that defendants are not entitled to summary judgment on Counts One and Two.

### 3. Aman's Claims Against the Village (Counts Three and Six)

The Complaint brings claims against the Village for alleged violations of Aman's First and Fourth Amendment rights. The Complaint alleges in Count Three that Mayor Peterson "directed" the Officers' retaliatory actions against Aman insofar as the Mayor had expressed a desire or plan to shut the Inn down. In Count Six, the Complaint alleges that the seizure of Aman occurred pursuant to a policy or custom of the Village or at the direction of the Mayor.

To support a claim for § 1983 liability against a municipality, a plaintiff must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." A plaintiff must do this by showing that the municipality had a "policy or custom" which caused the violation of her rights. *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978).

---

[14] Again, the parties agree as to the substance of Aman's comments during the 45 second discussion. Her comments are not discernible from listening to Video Exhibit A, at least not without audio enhancements.

There are four ways to prove a municipality's illegal policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019).

Defendants understandably construe the Complaint as alleging that Mayor Peterson was the final decisionmaker who ordered the alleged retaliatory and unreasonable seizure of Aman. They argue that the evidence developed during discovery has provided no support for those allegations.

The Court agrees with defendants' argument. The Officers on the scene made the decision to seize Aman. That the Mayor allegedly had a plan to shut down the Inn does not prove that she also directed the decision to seize Aman. The video footage, depositions, and Police Report all prove that the seizure of Aman occurred because of what transpired in her interactions with Officers Barker and Pereira. There is no evidence of a planned seizure at the behest of the Mayor. Nor is there any evidence of a Village policy or custom by which the allegedly unreasonable seizure occurred.

In response to the motion for summary judgment, plaintiff does not dispute the argument made by defendants. Instead, she changes her theory of liability. She now argues that Chief Harget was the final decisionmaker. And she argues that *Monell* liability is appropriate because Chief Harget "ordered Officer Barker and Pereira to report to the motel." Doc. 44 at PAGEID 822. She further argues that Chief Harget observed the Officers' actions in seizing Aman and ratified them by not taking action to stop the unconstitutional conduct.[15]

It is well-established that a party may not "expand its claims to assert new theories" in response to a motion for summary judgment. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). Even so, plaintiff's new theory can be put to rest. The evidence shows that Chief Harget called Officers Barker and Pereira to the Inn to help notify guests that they needed to evacuate. *See* Barker Dep. at 45–46 ("So our job was to go around and let them know that, hey, you know, the building is unsafe, it's being condemned, unfortunately you have to gather your belongings and leave."); Pereira Dep. at 35 (testifying that Chief Harget called them to the Inn to go "door to door informing everybody that unfortunately they were going to have to depart the property"); Harget Dep. at 48. There is no evidence that Chief Harget instructed the Officers to seize Aman, either when he called them to the Inn or while the encounter was unfolding. The video footage shows that the

[15] Plaintiff asserts a separate claim against Chief Harget for failure to intervene, which is addressed in Part IV.A.4 below.

Officers were already handcuffing Aman before Chief Harget exited his vehicle. Once Chief Harget walked towards them, he did not say anything or make any motions which could be construed as an instruction for the Officers to handcuff Aman or to place her in the back of the cruiser.

Plaintiff contends that Chief Harget's inaction amounted to his ratification of the Officers' conduct. This argument fails. For purposes of *Monell* liability, a decisionmaker's "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993). Otherwise, the municipality "would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from respondeat superior liability." *Id. See also Wright v. City of Euclid, Ohio*, 962 F.3d 852, 879 (6th Cir. 2020) ("A municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, solely because it employs a tortfeasor.") (internal quotation marks omitted).

Accordingly, the Court grants summary judgment to defendants on Counts Three and Six.

**4. Failure to Intervene Claim Against Chief Harget (Count Seven)**

A police officer who fails to intervene in a constitutional violation may be held individually liable when (1) he observed an unconstitutional action or had reason to know that an unconstitutional action was taking place, and (2) he "had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

The motion for summary judgment focuses solely on the first requirement. Defendants argue that Chief Harget "did not witness the events leading up to [Aman's] detainment because he was dealing with other matters and sitting in his car while these interactions were occurring." Doc. 35 at PAGEID 682. In support, defendants cite Chief Harget's testimony that the doors and windows of his cruiser were closed during the first phase of the Officers' encounter with Aman and that he was making phone calls. *See* Harget Dep. at 50–51.

The Court finds that a genuine dispute of fact exists as to whether Chief Harget observed the phase of the encounter lasting from Aman's initial approach until the Officers began to place her in handcuffs. Officer Pereira's body cam shows the driver's window down and Chief Harget's arm partially outside the car about one minute into the encounter. *See* Video Ex. B, time stamp 16:04:55. One could reasonably infer that the window had been down for most or all of the encounter to that point, particularly because the start of the Inn's security footage appears to show Chief Harget, sitting in his cruiser, talking to the Officers, who are standing in the parking lot. The Officers and Aman are near the cruiser, and a factfinder could determine that Chief Harget heard their exchange and perhaps could have seen portions of it in his rear and side-view mirrors. Moreover, when Chief Harget spoke

to Gori while Aman was held in the other cruiser, he spoke as though he knew of the conduct which provided the basis for her seizure. He told Gori that Aman had asked questions, "but it went from . . . her asking a question to it being escalated," and he added that "the reason she's in custody is because she was not cooperative with these officers." *See id.* time stamp 16:06:50, 16:08:08.

The Court thus denies the motion as to Count Seven.

**B. Due Process Claims (Counts Eleven, Fourteen, and Fifteen)**

**1. The Shutting Down of the Inn (Count Eleven)**

**a. Framing the Claim**

The Fourteenth Amendment protects individuals from governmental deprivation "of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. As owners of the Lake Inn, plaintiffs AS Hotel and Sonny and Gori allege that the Village of Buckeye Lake deprived them of their property interest by shutting down the Inn without notice or a pre-deprivation hearing. There is no dispute that plaintiffs had a property interest in the Inn and suffered a deprivation when it was forced to close for nearly a month. *See Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (elements of a procedural due process claim); *Ramsey v. Bd. of Educ. of Whitley Cnty.*, 844 F.2d 1268, 1273 (6th Cir. 1988) ("[T]he property interest in a person's means of livelihood is one of the most significant that an individual can possess.").

The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Generally, the owner of a property interest is entitled to "adequate procedural rights" prior to the deprivation. *Women's Med.*, 438 F.3d at 611. An important exception to the general rule of pre-deprivation process concerns extraordinary or emergency situations. The "failure to provide a pre-deprivation hearing does not violate due process in situations where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process." *United Pet Supply, Inc. v. City of Chattanooga, Tennessee*, 768 F.3d 464, 486 (6th Cir. 2014) (collecting cases). *Accord Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994) (a "prior hearing is not constitutionally required" under extraordinary situations in which there is "a special need for very prompt [governmental] action to secure an important public interest").

Plaintiffs did not receive a pre-deprivation hearing, and they contend that they should have. But a significant wrinkle to plaintiffs' procedural due process claim is who they have, and have not, named as a defendant. Code Enforcement Officer Adkins testified that he and the zoning inspector

made the decision to close the Inn following the inspection. *See* Adkins Dep. at 41–42; *see also* Harget Dep. at 47. Neither Adkins nor the zoning inspector are named as defendants.

Count Eleven of the Complaint identifies the Village as the defendant against whom the claim is being brought. *See* Compl., ¶ 138. The Complaint alleges that the deprivation of due process occurred "as a result of its [the Village's] policy or custom." *Id.* In their briefing, plaintiffs argue that defendant Mayor Peterson made the decision to shut down the Inn and that the Village is liable because she was a final decisionmaker. *See* Doc. 44 at PAGEID 823. *See also* Village of Buckeye Lake Charter, Art 5.02 (granting to the office of Mayor the powers of "chief executive officer of the Village," including exercising "control over all departments and divisions thereof, except Council"). This argument is consistent with the allegations made in the Complaint about the Mayor being responsible for closing the Inn on April 3, 2023. *See* Compl., ¶¶ 84, 182, 192, 200.

The Court thus construes Count Eleven as a *Monell* claim. In particular, plaintiffs' theory is that the Village is liable for the alleged constitutional violation because Mayor Peterson was the final decisionmaker who ordered the Inn to be shut down without prior notice and a hearing. *See Jackson*, 925 F.3d at 828 (*Monell* liability can be established when the constitutional violation is ordered or ratified by "an official with final decision making authority").

**b. Mayor Peterson's Role in Ordering or Ratifying the Decision**

Defendants argue that discovery has proved that Mayor Peterson did not order the Inn to be shut down. Again, Adkins testified that he and the zoning inspector made the decision. Adkins also testified that he told the Mayor he would be conducting an inspection of the Inn on April 3 but she did not give him instructions or direction about the inspection and did not express a desire to close the Inn. *See* Adkins Dep. at 27–29. The Mayor was not present during the inspection and learned of the decision to shut down the Inn only after the fact. *See id.* at 45–46; Peterson Dep. at 35.

Plaintiffs argue that the emails discussed in Part I.H above establish that the Mayor was responsible for the decision. In those emails, Mayor Peterson: (1) told Adkins "to do everything possible to prevent them from reopening and continue to operate an unsafe and illegal facility in our community," Doc. 44-3; (2) said to the Village attorney that the Inn "can't open until the village sees" statements from a "professional exterminator" and a "professional cleaner," Doc. 1-1 at PAGEID 61; and (3) expressed to Adkins that the situation at the Inn was "unacceptable" and she was "getting tired of the kid glove approach," Peterson Dep. at 47.

As defendants point out, a critical flaw in plaintiffs' theory is that each of the emails were composed and sent after the April 3 decision to shut down the Inn. The emails are dated April 5, April

16, and June 2, 2023. The content of the emails do not suggest that the closing of the Inn was preplanned or ordered by Mayor Peterson. The emails instead express the Mayor's desire that the Inn not reopen until the code violations were resolved. Ultimately, this is a point which plaintiffs concede in their brief. *See* Doc. 44 at PAGEID 824 (arguing that the emails "show the Mayor dictating her own terms and processes to *re-open* the motel") (emphasis added). Thus, the Court finds on the summary judgment record that there are no facts from which a factfinder could reasonably conclude that Mayor Peterson ordered or made the decision to shut down the Inn.

Plaintiffs do not expressly argue that the Mayor ratified the decision, but the argument should be addressed, given plaintiffs' clear belief (based on the emails) that she approved of the decision and given plaintiffs' attack on the reasonableness of the decision.

The failure to provide a pre-deprivation hearing does not violate due process if the government official "reasonably believed that immediate action was necessary to eliminate an emergency situation" and if adequate post-deprivation process is later provided.[16] *United Pet Supply*, 768 F.3d at 486. In the Court's assessment, even when viewing the evidence in a light most favorable to the plaintiffs, the Mayor acted reasonably in believing and relying on what Village officials told her about the basis for the decision to close the Inn. The record is undisputed that her understanding as to the reasons why the Inn was immediately shut down derived from what Adkins, the zoning inspector, and Chief Harget reported to her about the code violations they had observed during the inspection, as well as the structural deterioration she had seen in person. *See* Peterson Dep. at 35–36; Adkins Dep. at 46. It was also her understanding that the Village attorney was consulted prior to the decision. *See* Peterson Dep. at 32–33.

The Mayor's reliance on what the appropriate Village officials told her was all the more reasonable in light of the restraints imposed by the Village Code to minimize the risk of an erroneous deprivation. *See Flatford*, 17 F.3d at 167 (the risk of an erroneous, pre-hearing deprivation in an emergency situation is minimized when the responsible government official is acting pursuant to "the standards of a narrowly drawn statute") (citing *Fuentes v. Shevin*, 407 U.S. 67, 91 (1972)); *cf. Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (considering "the risk of an erroneous deprivation" when determining the process that is due). The Village Code contained provisions on unsafe structures, unsafe and unsanitary conditions, and dangerous premises, and it authorized code officials to take emergency measures and implement temporary safeguards, including evacuation of a building, when

[16] The provision of post-deprivation process is discussed separately below in Part IV.B.1.d.

it was necessary in their opinion. *See* 2018 IPMC §§ 108.1.1, 108.1.3, 108.1.5, 109.1, 109.2. Plaintiffs do not offer any evidence suggesting that Mayor Peterson knew or should have known that the officials had failed to follow the Code's requirements.

Plaintiffs attack the decision to close the Inn in two ways, but neither supports a conclusion that the Mayor's reliance on the Village officials was unreasonable. First, they cite Adkins' deposition testimony and argue that he lacked proper training to decide that the structural conditions warranted the Inn's closure. *See* Adkins Dep. at 42 (testifying that he was not a trained engineer). However, this argument fails to support an inference that the Mayor's reliance on Adkins was unreasonable. Plaintiffs have not attempted to show that the Mayor was aware of the alleged lack of training. Adkins was employed as the Code Enforcement Officer before Peterson took office. *See id.* at 16–17 (testifying that he had been hired "three mayors ago" and testifying to his background and qualifications to perform his job). Moreover, plaintiffs' argument overlooks the following established facts: the structural issues were readily apparent to Adkins's observation (and thus his lack of formal engineering training was not a reason to dismiss his concerns); the unsafe conditions found at the Inn encompassed more than structural issues; and the zoning inspector, whose training plaintiffs do not challenge, was equally part of the decision to close the Inn for unsafe conditions. *See* Adkins Dep. at 41–42; Harget Dep. at 47; Doc. 34-3.

Plaintiffs' second attack is to downplay some of the code violations as "cosmetic." Doc. 44 at PAGEID 817. However, they have not put forth facts from which it could be found that Mayor Peterson knew or should have known that an emergency situation did not exist. Sonny and Aman both testified that they had no reason to question the validity of the code violations which Adkins and the zoning inspector found. *See* Singh Dep. at 57 (Q: "[W]as there anything in the notices that was false?"; A: "No."); A. Kaur Dep. at 66–67 (Q: "In other words, was there anything in the notice of violations that the motel was told to fix that it did not actually need to be fixed?"; A: "No. I didn't notice any."). The violations included unsanitary room conditions, unsafe light switches, faulty smoke detectors, mold, failing guardrails and handrails, deteriorated structural support beams, deteriorated concrete, broken windows; and holes in exterior walls. *See* Doc. 34-3.

The April 9, 2023 report from the engineering firm hired by plaintiffs confirmed the exterior structural concerns. *See* Doc. 34-4. *See also* Singh Dep. at 58–59 and A. Kaur Dep. at 67–70 (both testifying that the issues identified in the April 9, 2023 report were accurate). Plaintiffs now argue that the structural concerns were exaggerated and claim the Inn had "passed an inspection from the State Fire Marshal just days before the closure." Doc. 44 at PAGEID 795. But there is no evidence to

support this assertion. Plaintiffs' brief cites a passage of Mayor Paterson's deposition in which plaintiffs' counsel asked her if she knew the Inn had passed a fire marshal inspection the week before it was shut down. *See* Peterson Dep. at 50. She responded that the Inn did not pass inspection. *See id.* Plaintiffs have put forth no evidence to the contrary.

Accordingly, the Court finds that defendants are entitled to summary judgment on plaintiffs' *Monell* claim regarding the Village's failure to provide a pre-deprivation hearing.

**c. Failure to Train**

In their brief in opposition to the motion for summary judgment, plaintiffs contend that the Village is liable under *Monell* for its failure to train Adkins for his role as a code official. This claim is absent from the Complaint. As such, the Court rejects plaintiffs' attempt to assert a new claim for which defendants did not have notice. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.")).

**d. Lack of Post-Deprivation Process**

The government must afford adequate post-deprivation process even when an emergency situation justifies the deprivation before a hearing can be held. *See United Pet Supply*, 768 F.3d at 486. Plaintiffs argue that they did not receive adequate post-deprivation process in three ways: (1) the delay in issuing the violation notices; (2) the Mayor's intention to "stack" the hearing board against plaintiffs; and (3) the failure to receive a hearing. Doc. 44 at PAGEID 824.

Again, plaintiffs frame their claim as one for *Monell* liability, with Mayor Peterson as the final decisionmaker. Plaintiffs point to the post-April 3 emails sent by Mayor Peterson as evidence of her role in the Village's alleged failure to provide adequate post-deprivation process.

The Court agrees that the Mayor's emails show that she desired for the Inn to remain closed until the violations were resolved. *See* Doc. 1-1 at PAGEID 61–62; Doc. 44-3. Even so, there is no evidence that she was responsible for any delay in Adkins issuing the notices of the code violations. *See* Doc. 34-3 (notices dated April 13, 2023). In testimony that is not controverted, the Mayor stated that she was unaware of the delay and that she had no input into issuing the notices. *See* Peterson Dep. at 56–57. *See also* Doc. 1-1 at PAGEID 40–41 (showing that the Mayor was not copied on the emails in which the Inn's counsel asked Adkins about when the notices would be issued). Adkins

explained that it took him some time to write the notices because he consulted with the Village attorney and because of the "length" and "multiple" number of violations. *See* Adkins Dep. at 44–45.

Plaintiffs' next argument – concerning the Mayor's purported desire to stack a board which would hear their appeal of the notices – also falls short of showing a due process violation. Mayor Peterson in fact had the right under the Village Code to appoint the board which would hear plaintiffs' appeal. *See* 2018 IPMC § 111.2. Plaintiffs do not challenge the facial validity of the Code provision. Moreover, the Mayor's email did not use the word "stack" or any language to that effect. *See* Doc. 1-1 at PAGEID 65 (April 20, 2023 email). In the email, the Mayor simply identified two of the individuals whom she wished to appoint to the hearing board. *See id.* Plaintiffs have not offered any evidence to show those individuals were biased in favor of the Village or prejudiced against the plaintiffs.

Plaintiffs' final procedural due process theory concerns the lack of a hearing on their appeal of the notices of violations. Defendants acknowledge that plaintiffs correctly exercised their right of appeal. On April 18, 2023, five days after the notices were issued, plaintiffs' legal counsel provided the Village's attorney with a "written application under Section 111.1 of the 2018 IPMC." Doc. 1-1 at PAGEID 58; *see* 2018 IPMC § 111.1 (allowing 20 days after a notice is served to file a written application for appeal).

The Court finds that plaintiffs cannot prove the lack of a hearing amounted to a due process violation under their *Monell* theory. Mayor Peterson took the appropriate steps to make a hearing available to plaintiffs. After she was informed of the appeal, the Mayor sent an email to Village officials on April 20 identifying two individuals to serve on the hearing board. *See* Doc. 1-1 at PAGEID 65. Adkins responded to her within thirty minutes and explained that she needed to appoint a third voting member under the applicable rules. *See id.*; *see also* 2018 IPMC § 111.2. Adkins asked the Mayor to let him know "[w]hen you create this Board." Doc. 1-1 at PAGEID 65. Adkins also explained that he, as "the current Code official," would serve as a non-voting member on the board and would "go over the rules" with the voting members. *Id.* Mayor Peterson identified a third person and spoke with all three individuals to confirm their willingness to serve on the board. *See* Peterson Dep. at 44–46. She informed Adkins of her third selection and he then spoke with the three individuals. *See id.* at 46.

The hearing board never met, but plaintiffs' *Monell* claim rests on Mayor Peterson being the final decisionmaker who ordered or ratified the allegedly unlawful action. There is no proof that she did. She performed her function under the IPMC correctly. It was then up to the board to select a

chairman, who would then give notice of a hearing date within 20 days of the filing of the appeal. *See* IPMC §§ 111.2.2, 111.3.

The record also makes clear that the need for a hearing became moot. Simultaneous to the appeal, plaintiffs' legal counsel asked for a reinspection of the Inn. *See* Adkins Dep. at 47. Adkins performed the reinspection and gave plaintiffs approval to reopen the Inn, which they did by April 28, 2023. *See id.* at 47–48; A. Kaur Dep. at 70–72. The reopening occurred before the period to hold a hearing had elapsed, which was 20 days after April 18. *See also* Singh Dep. at 61 (when asked about the appeal, testifying that he had "already fixed" all of the problems at issue). The Court finds that there was no due process violation by the Village under these circumstances.

**e. Summary**

In sum, the Court grants summary judgment to defendants with respect to all of plaintiffs' *Monell* claims for procedural due process violations, including the shutting down of the Inn without a prior hearing and the alleged lack of post-deprivation process.

**2. The Towing of Vehicles (Count Fourteen)**

The Complaint alleges that three vehicles belonging to the individual plaintiffs were towed from the Inn's parking lot without proper warning. The Complaint alleges that the unlawful towing occurred "pursuant to policy, custom, practice or procedure of Defendant Village of Buckeye Lake," and specifically "via the actions" of Mayor Peterson. Compl., ¶ 170. Here too, the Court construes the claim as one for *Monell* liability against the Village.

Discovery has produced evidence of only one of plaintiffs' vehicles having been towed – Sonny's truck. *See* Singh Dep. at 51–54; A. Kaur Dep. at 61. Sonny said a warning notice was placed on his truck at 9:00 a.m. on April 3, 2023. *See* Singh Dep. at 51–54. Though the notice gave him 24 hours to move the truck, it was towed at 8:20 a.m. on April 4. *See id.* Plaintiffs argue that the failure to wait a full 24 hours before towing was a due process violation.

The record is devoid of evidence to tie the premature towing to Mayor Peterson or to a policy or custom of the Village. According to Sonny, a tow company took his truck under the supervision of a police officer named Matt. *See id.* at 52. As such, defendants are entitled to summary judgment on the due process claim relating to the towing of vehicles.

**3. Substantive Due Process (Count Fifteen)**

Plaintiffs bring a substantive due process claim against "[a]ll Defendants." Compl., ¶ 174. They allege that the shutting down of the Inn was conscience-shocking, as well as arbitrary and capricious. Plaintiffs' briefing narrows their focus to one defendant: Mayor Peterson. They argue that

Mayor Peterson's emails shows she harbored ill-will against plaintiffs and carried out a vendetta to "do everything possible to prevent them from reopening and continue to operate an unsafe and illegal facility in our community." Doc. 44-3.

Plaintiffs' argument picks up on two variations of substantive due process claims. One is "the right to be free from conscience-shocking actions." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). "Only the most egregious official conduct" can satisfy this standard. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). *See also McIntosh v. City of Madisonville, Kentucky*, 126 F.4th 1141, 1149 (6th Cir. 2025). The second is the "right not to be subjected to arbitrary or irrational zoning decisions." *White Oak Prop. Dev., LLC v. Washington Township*, 606 F.3d 842, 853 (6th Cir. 2010) (quotation omitted). To prevail under this theory, a property owner must show that the official's decision lacked a rational relationship to a legitimate governmental purpose. *See id.*

The Court finds that plaintiffs' substantive due process arguments fail. The record establishes without dispute the validity of the code violations for which Adkins issued notices. *See* Doc. 34-3; Doc. 34-4; Singh Dep. at 57–59; A. Kaur Dep. at 66–70. Under the IPMC, the violations justified the taking of emergency measures. *See* 2018 IPMC §§ 109.1, 109.2 (providing that the code official may, upon finding imminent danger due to a compromised building or structure or imminent danger due to unsafe conditions, take the action he deems "necessary to meet such emergency," including evacuation of the premises). Even if the code officials arguably could or should have implemented emergency measures short of a full closure of the Inn, their decision was certainly not conscience-shocking. It was designed to protect guests, and it bore a rational relationship to the Village's strong interest in protecting the public.

As explained above, Mayor Peterson was not part of the decision to close the Inn. *See* Adkins Dep. at 28–29, 45–46; Peterson Dep. at 35; Harget Dep. at 47. Her post-decision support for keeping the Inn closed until plaintiffs remedied the violations is hardly conscience-shocking. But even if the Mayor's words could interpreted as a flat-out order to Adkins to "prevent them from reopening," in reality she did not carry through with her demand. She was present at the reinspection when Adkins decided to allow plaintiffs to reopen the Inn, and she did nothing to undermine or undo his decision. *See* Adkins Dep. at 48; Peterson Dep. at 58–59.

The Court thus finds that defendants are entitled to summary judgment on the substantive due process claim.

### C. Discriminatory Animus-Based Claims (Counts Sixteen to Eighteen)

#### 1. Conspiracy (Count Sixteen)

The Complaint alleges that defendants conspired to deprive the individual plaintiffs of their civil rights because of discriminatory animus against plaintiffs' national origin. *See* 42 U.S.C. § 1985(3). Defendants argue that the conspiracy claim fails under the intracorporate conspiracy doctrine. According to this doctrine, when "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy," as required by § 1985(3). *Jackson*, 925 F.3d at 817. Each defendant was an employee of the Village of Buckeye Lake.

Plaintiffs have not attempted to defend their conspiracy claim against the motion for summary judgment. As such, the Court grants summary judgment to defendants on this claim.

#### 2. Equal Protection (Counts Seventeen and Eighteen)

The final two claims are for violations of plaintiffs' rights to equal protection. The Fourteenth Amendment prohibits a state from denying any person within its jurisdiction equal protection of the law. U.S. Const. amend. XIV. The Equal Protection Clause prevents states from making distinctions that "(1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010).

The Complaint asserts the third type of equal protection claim. The Complaint alleges that plaintiffs, who were born in India, were subjected to discriminatory treatment because of their national origin and race. Specifically, the Complaint alleges that they were treated differently than similarly-situated persons because the Village "as directed by Mayor Peterson failed to follow any notice procedures required by the Village's Code." Compl., ¶¶ 192, 200.

In their briefing on the equal protection claims, plaintiffs abandon the Complaint's concern with an alleged failure to follow notice procedures. Again, discovery has provided no evidence that Mayor Peterson was aware of a delay in the issuing of the notices or that she was responsible for the failure to convene the hearing board. And there is no evidence of a non-minority, similarly-situated person or business who received more favorable treatment than plaintiffs in this regard.

Plaintiffs have instead turned their focus to the shutting down of the Inn and allege that it was "motivated by Mayor Peterson's discriminatory grudge against Plaintiffs' Indian nationality." Doc. 44 at PAGEID 825. This targeting theory asserts the second type of equal protection claim. Though the theory is newly stated in plaintiffs' response brief, the Court notes that the Complaint contained allegations of racial targeting which sufficiently gave notice of the claim. *See* Compl., ¶¶ 57, 191, 199.

To prevail on their claim, plaintiffs must show that a government actor intentionally discriminated against them because of their membership in a protected class. *See Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005). Plaintiffs' claim cannot survive summary judgment. The alleged discriminatory action is the closing of the Inn, but the two individuals who made that decision – Adkins and the zoning inspector – are not named as defendants. The Complaint names Mayor Peterson as a defendant and she is alleged to have ordered the shutting down of the Inn, but the record does not support the allegation. *See* Adkins Dep. at 28–29, 45–46; Peterson Dep. at 35; Harget Dep. at 47.

The record also does not support an inference that Mayor Peterson harbored discriminatory animus against plaintiffs based on their national origin or race. Plaintiffs cite a single statement which Mayor Peterson allegedly made to Sonny at some earlier and unspecified point in time. Sonny testified that he was late in paying his water bill and the Mayor came to the Inn to talk to him about it. She allegedly told him, "Foreign people give people a hard time." Singh Dep. at 25. Without more, this isolated and vague remark does not show that the Mayor later acted with discriminatory animus. *See Sullivan v. Metro Knoxville HMA, LLC*, No. 24-5531, 2025 WL 263456, at *4 (6th Cir. Jan. 22, 2025) (holding that "intentional discrimination can't 'be based on vague, ambiguous, or isolated remarks'") (quoting *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000)).

**V. Conclusion**

For the reasons stated above, defendants' motion for summary judgment (Doc. 35) is granted in part and denied in part. It is denied with respect to plaintiff Aman Kaur's First and Fourth Amendment claims against Officers Barker and Pereira (Counts One, Two, Four, and Five) and her failure to intervene claim against Chief Harget (Count Seven). The Court grants summary judgment with respect to all other claims.

*s/ James L. Graham*
JAMES L. GRAHAM
United States District Judge

DATE: September 23, 2026